IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| REBECCA MARIE KING, | § | |
| | § | |
| *Plaintiff,* | § | SA-21-CV-00245-FB |
| | § | |
| vs. | § | |
| | § | |
| NORTH EAST INDEPENDENT | § | |
| SCHOOL DISTRICT, SEAN A MAIKA, | § | |
| | § | |
| *Defendants.* | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendants' Motion for Summary Judgment [#25]. All pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#9]. The undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motion be **granted**.

**I.  Background**

This case arises out of the termination of Plaintiff Rebecca Marie King's employment with Defendant North East Independent School District ("NEISD") in March 2020. King, who is Mexican American, alleges that she was the victim of employment discrimination based on her race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and Chapter 21 of the Texas Labor Code. King alleges that NEISD and Defendant Sean A. Maika, Superintendent of NEISD, took discriminatory actions against her "to achieve a completely white staff in the Superintendent's office and to promote a less qualified

1

Caucasian person into King's position."  (Compl. [#1], at ¶ 34.)  According to King, these discriminatory actions include demotion of King, cutting King's pay, placing King in a less favorable assignment, and ultimately terminating her employment.  (*Id.* at ¶¶ 35–36.)

Defendants have now moved for summary judgment, arguing that King's race, color, and national origin claims of discrimination fail as a matter of law.  King has filed a response in opposition [#28], to which Defendant filed a reply [#30].  The motion is ripe for the Court's review.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *Miss. River Basin Alliance v. Westphal*, 230 F.3d

170, 174 (5th Cir. 2000).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."  *Westphal*, 230 F.3d at 174.

### III.  Defendants' Objections to King's Summary Judgment Evidence

Defendants object to several pieces of evidence attached to King's summary judgment response—namely, portions of King's declaration ([#28-2], at 2–6), portions of Mr. Trevino's declaration ([#28-2], at 41–42), and King's performance evaluations by Dr. Gottardy ([#28-2], at 8–32).  (*See* Objections [#31].)  The undersigned sustains Defendants' objections to the statements in the King and Trevino declarations that are conclusory and constitute legal conclusions, including but not limited to King's statement that "NEISD took discriminatory actions" and Gottardy's statement that "there was systematic discrimination throughout the District particularly against Hispanics primarily at the Title I level."  Defendants' other objections are overruled.

### IV.  Summary Judgment Record

The summary judgment record establishes the following:[1]  According to King, she is Hispanic, bilingual, and has darker skin than "most white Anglos."  (King Decl. [#28-2], at ¶ 2.) She began working for NEISD in June 2008 as Administrative Assistant to the Associate Superintendent of Operations.  (King Decl. [#28-2], at ¶ 2; Compl. [#1], at ¶¶ 10–11; Answer [#2], at ¶¶ 10–11.)  Prior to working for NEISD, King had worked for other school districts in

---

[1] When a fact is disputed, it is noted.

Texas for approximately 16 years.  (King Decl. [#28-2], at ¶ 3.)  In 2011, King was promoted to Executive Associate to the Superintendent of NEISD, where she was part of the Executive Staff of then Superintendent Dr. Brian Gottardy.  (Compl. [#1], at ¶ 12; Answer [#2], at ¶ 12; King Decl. [#28-2], at ¶ 4.)

Dr. Gottardy and King had a strong working relationship, and King received exemplary evaluations from Dr. Gottardy every year during his tenure.  (King Decl. [#28-2], at ¶ 3; Evaluations [#28-2], at 8–32.)  Dr. Gottardy consistently praised King's work ethic, character, and professional attitude year after year, commenting that he "could not have asked for a better working relationship"; that her quality of work was "second to none!"; that she was "extremely productive"; that her "glass is always ½ full"; and that she was "the best ex. assistant in the whole world."  (Evaluations [#28-2], at 11–32.)

Dr. Gottardy retired in June 2019, and Dr. Maika, who is White and non-Hispanic, was appointed to the position of Interim Superintendent and received his official appointment as new Superintendent of NEISD on September 25, 2019.  (Compl. [#1], at ¶¶ 15, 17; Answer [#2], at ¶¶ 15, 17; King Decl. [#28-2], at ¶ 5.)  At the time of Dr. Maika's appointment, he had three support staff members assigned to him: King, Executive Associate; Peggy Turner, Secretary; and Edith Broadnax, Receptionist.  (Maika Aff. [#25-1], at ¶ 6.)  Both Ms. Turner and Ms. Broadnax are also White and non-Hispanic.  (Maika Dep. [#28-2], at 71:1–6; King Decl. [#28-2], at ¶ 8.)

As Executive Associate, King had several duties, one of which was to serve as the primary liaison between the Office of the Superintendent and the NEISD Board of Trustees. (Maika Aff. [#25-1], at ¶ 11.)  This role required attendance at Board meetings and preparation of minutes from Board meetings as required by the Texas Open Meetings Act into a formal

record for publication on the NEISD website. (*Id.* at ¶¶ 11–12.) According to Trustee Joseph Trevino, King was well regarded by the entire Board. (Trevino Decl. [#28-2], at ¶ 4.)

Almost immediately upon his appointment, Dr. Maika claims he began to have issues with King. First, Dr. Maika claims he discovered upon his appointment that King was several months behind on preparing the minutes for Board meetings and publishing them to the NEISD website. (Maika Aff. [#25-1], at ¶ 13.) King contests these allegations. (King Decl. [#28-2], at ¶ 11.)

Secondly, Dr. Maika asserts that King abdicated her responsibilities with respect to posting the agenda for NEISD's Monday, September 30, 2019 Board meeting, resulting in the meeting having to be rescheduled. (Maika Aff. [#25-1], at ¶ 15.) Normally, Ms. Turner would post the meeting agenda on the NEISD website 72 hours in advance of the meeting, which is required by the Texas Open Meetings Act. (*Id.* at ¶¶ 15–16.) But Ms. Turner was on leave the Friday afternoon before the September meeting, and Ms. King was responsible for posting the agenda on her behalf. (*Id.* at ¶ 17; Turner Aff. [#25-1], at ¶ 9.) Ms. Turner asserts that she told King ahead of time that she would be taking leave on Friday afternoon and would need King to post the agenda; verbally reminded King about posting the agenda upon leaving for work Friday afternoon; provided King a physical copy of the Board agenda for posting; and emailed King a copy of the agenda at 12:03 p.m. on Friday and told her it could be posted later. (Turner Aff. [#25-1], at 96, ¶ 9.) A copy of the email is in the record. (Turner Email [#25-1], at 99.) King denies that Ms. Turner ever verbally spoke to her about the agenda or handed her the agenda to post, and claims she was away from her desk most of that Friday working with files in another part of the building, so she did not see Ms. Turner's email until it was too late to post it. (King Decl. [#28-2], at ¶ 5.)

Dr. Maika learned on Saturday, September 28, 2019, that the agenda had not been posted and immediately contacted King to find out what happened.  (Maika Aff. [#25-1], at ¶ 18.)  King claims this was the first time she became aware of the agenda issue.  (King Decl. [#28-2], at ¶ 6.)  During their conversation, Dr. Maika relayed to King that it was too late to timely post the agenda, not to do so, and that the meeting would have to be rescheduled.  (Maika Aff. [#25-1], at ¶ 18.)  Dr. Maika claims King posted the agenda notice anyway and that he had to subsequently direct her to take down the notice.  (*Id.* at ¶ 19.)  King admits she posted the agenda, but claims she posted it only "to test the software" and that she had promptly un-posted it before Dr. Maika requested she do so.  (King Decl. [#28-2], at ¶ 6.)

Thirdly, Dr. Maika asserts that there was an incident with King in December 2019, when Amy Lane, NEISD Director of Partnerships, emailed Executive Staff, including King, about an inquiry she received from a business partner seeking a video testimony from NEISD personnel on some of its work in the district.  (Maika Aff. [#25-1], at ¶ 20; Lane Email [#25-1], at 9.)  King told Dr. Maika that she was not aware of any policy prohibiting the requested testimonial, and, relying on the representation, Dr. Maika authorized Ms. Lane to move forward in obtaining one.  (Maika Aff. [#25-1], at ¶ 20; King Email [#25-1], at 8.)  According to Dr. Maika, he later learned that Associate Superintendent Donna Newman had emailed King that she was "hesitant to move forward" with the testimonial and that she would "prefer that [the Executive Director of Human Resources] weigh in on this before proceeding."  (Maika Aff. [#25-1], at ¶ 20; Newman Email [#25-1], at 8; Trevino Dep. [#25-1], at 6:16-19.)  Dr. Maika accuses King of failing to inform him of Dr. Newman's email.  (Maika Aff. [#25-1], at ¶ 20.)  According to Dr. Maika, King first denied ever receiving the email, but then admitted to receipt when presented with a copy.  (*Id.* at ¶ 21.)

Finally, Dr. Maika also asserts that King did not adequately handle her responsibilities as to preparing certificates and recognitions for students and members of the community for special achievements, which were typically presented at NEISD Board meetings, causing disorganization and confusion. (*Id.* at ¶ 22.) King contests these assertions. (King Decl. [#28-2], at ¶ 11.)

Allegedly due to these concerns, Dr. Maika reassigned King on January 15, 2020, to a new position, Administrative Assistant to the Senior Director for Student Leadership and Well Being, Tyler Shoesmith. (Maika Aff. [#25-1], at ¶¶ 10, 23; King Decl. [#28-2], at ¶ 5.) Ms. Turner assumed King's duties, but no one was assigned to formally fill King's position. (Compl. [#1], at ¶ 21; Answer [#2], at ¶ 21; Maika Aff. [#25-1], at ¶ 24.) King's last annual salary for the Executive Associate position under Dr. Maika was $81,913.00. (Compl. [#1], at ¶ 13; Answer [#2], at ¶ 13.) Although her salary remained the same for the 2019-2020 school year, the reassignment was intended to result in a pay cut to a paraprofessional salary of $21.04 per hour beginning the following school year. (Maika Aff. [#25-1], at ¶ 23; King Decl. [#28-2], at ¶ 7.) In addition to her reduction in salary, King asserts that the scope of her responsibilities and amount of her work were reduced as well. (King Decl. [#28-2], at ¶ 7.)

Approximately one month later, it was discovered that a Board meeting agenda notice had gone missing from the District's Board agenda posting site over the weekend. (Jimenez Aff. [#25-1], at 209, ¶ 5; Admin. Leave Ltr. [#25-1], at 213.) The meeting had to be canceled because the agenda was not posted continuously for at least 72 hours prior to the meeting. (Jimenez Aff. [#25-1], at 209, ¶ 6.) It was suspected that King was responsible for intentionally removing the agenda because she still had the login credentials for the site. (*Id.* at 209–10, ¶ 6.) King was placed on administrative leave on February 10, 2020, to investigate the issue. (*Id.* at

209, ¶ 5; Admin. Leave Ltr. [#25-1], at 213.)  King vigorously contests the accusation that she intentionally removed a Board agenda and claims that many others had access to the site and could have removed the posting.  (King Decl. [#28-2], at ¶ 14.)

During her administrative leave, NEISD conducted an investigation into King's performance history and discovered other issues that raised "additional serious concerns." (Jimenez Mem. [#25-1], at 215.)  The investigation memorandum by Rudy Jimenez, Assistant Superintendent, refers to both suspicions about King removing the Board agenda and allegations regarding King's handling of an invoice from the Omni Hotel in Dallas, where she had attended a District-paid convention from September 19, 2019, through September 21, 2019.  (*Id.*)

The memorandum reflects that King incurred personal expenses on her District American Express card after the convention in the amount of $350.29 and never reimbursed the District for these funds.  (*Id.*; Turner Aff. [#25-1], at 96, ¶¶ 11, 15; Omni Receipt [#251], at 107–08.)  In her defense, King asserts that she was completely transparent with staff that her husband was joining her at the convention and that they had planned to stay an extra day to see their granddaughter play in a softball game.  (King Decl. [#28-2], at ¶ 10.)  Upon her return, King circled the personal charges on her receipt and provided it to Ms. Turner.  (King Decl. [#28-2], at ¶ 10; Omni Receipt [#251], at 107–08.)  King claims she did not have authority to reconcile the reimbursement and waited for Ms. Turner to do so, but Ms. Turner never did.  (King Decl. [#28-2], at ¶ 10.)

The memorandum also accuses King of failing to attempt to have tax charges removed from her hotel bill for food and beverage during her stay and for using the District's Amazon account, which is a tax-exempt account, for purchasing personal items, including a margarita machine.  (Jimenez Mem. [#25-1], at 216.)  The memorandum concluded that these actions

violated Board Policy CH and recommended King's termination.  (*Id.*)  Board Policy CH states, "District employees shall not be permitted to make purchases for personal use through the District's business office" and that "[p]ersons making unauthorized purchases shall assume full responsibility for all such debts."  (Board Policy CH [#25-1], at 232.)  King was terminated on March 6, 2020.  (Maika Aff. [#25-1], at ¶ 9; Termination Ltr. [#25-1], at 234.)

Following her termination, King filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on July 30, 2020, alleging race, color, and national origin discrimination.  (EEOC Charge [#25-1], at 20–22.)  In the Charge, King alleges that she was demoted from her position in January 2020 due to Ms. Turner's failure to perform her duties with respect to posting the Board Meeting agenda.  (*Id.* at 21.)  King further alleges she was replaced by Ms. Turner, who was less qualified and non-Hispanic.  (*Id.*)  King complains that she was terminated for the pretextual reason that she abused Amazon ordering privileges, when in truth Amazon confused a personal order with a District order, and that the District had not previously disciplined employees for such mistakes and instead corrected them administratively.  (*Id.*)  King's Charge also references the Dallas Omni bill, alleging that she turned in all receipts to Ms. Turner following the convention, who was in charge of reconciling any charges requiring reimbursement.  (*Id.*)

Following King's termination, NEISD's Internal Audit Department conducted an additional review of the financial transactions of the Superintendent and Board of Trustees Organizations.  (Audit [#25-1], at 12–18.)  The audit made several findings regarding King's alleged mishandling of District transactions.  (*Id.*)  According to the audit, King made personal purchases and had them shipped to her home address utilizing the District's Amazon Prime Account; made multiple Kindle e-book purchases with her District-issued purchase card and

reimbursed the District for just two of them; made flight purchases directly through Southwest rather than using the District's travel agent; paid for an upgrade instead of selecting the lowest fare possible; changed the flight of a non-employee on the trip using her District purchase card; and booked non-refundable reservations for District representatives on her purchase card.  (*Id.*) King filed this lawsuit in March 2021.

## V.  Analysis

The Court should grant Defendants' motion for summary judgment as to King's claims of race, color, and national origin discrimination under Title VII, Section 1981, and the Texas Labor Code.  Title VII makes it unlawful for an employer to discharge an employee because of her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  Chapter 21 of the Texas Labor Code also prohibits discrimination based on "race, color, . . . or national origin." Tex. Lab. Code § 21.051.  Section 1981 protects against race-based discrimination but not discrimination based solely on national origin.  42 U.S.C. § 1981; *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987).  King's discrimination claims under Section 1981 and the Texas Labor Code are governed by the same standards as Title VII, except that Section 1981 does not require exhaustion of administrative remedies.  *Chen v. Ochsner Clinic Found.*, 630 Fed. App'x 218, 227 (5th Cir. 2015); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012).  Exhaustion is not at issue in this case.

Because King does not have any direct evidence of discrimination, all of her claims are subject to the same burden-shifting framework set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Hernandez*, 670 F.3d at 650; *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).  Under the *McDonnell Douglas* framework, a plaintiff claiming race, national origin and/or color

discrimination must first establish that he or she is (1) a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group.  *See Roberson-King v. La. Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018).  After the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision.  *See id.*  This is a burden of production only, not persuasion; it involves no credibility assessment.  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  If the employer articulates a legitimate reason, the burden shifts back to the plaintiff to show the reason is pretext for unlawful discrimination. *Roberson-King*, 904 F.3d at 381.

Defendants argue they are entitled to summary judgment on all of King's claims because she has not established a prima facie case of discrimination, in that she does not have evidence that she was treated less favorably than another similarly situated employee outside her protected class, and she has failed to raise a genuine issue of material fact as to pretext.  The Court need not reach the first issue.  Assuming, for the sake of argument, that King is able to establish her prima facie case of discrimination, Defendants are correct that she has not provided the Court with sufficient evidence to rebut Defendants' legitimate, non-discriminatory reasons for her reassignment and termination to raise a fact issue on pretext.  Therefore, she cannot prevail on her causes of action under Title VII, Section 1981, and the Texas Labor Code, and Defendants are entitled to summary judgment.

To survive summary judgment on the issue of pretext, King must present evidence that would allow a reasonable trier of fact to conclude that Defendants' articulated reasons for the

adverse employment actions at issue (here King's reassignment to a less desirable position[2] and ultimate termination) "were merely a pretext for discrimination." *Grimes v. Tex. Dep't of Health*, 102 F.3d 137, 143 (5th Cir. 1996).  In other words, the evidence taken as a whole must both (1) create a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) create a reasonable inference that King's race, color, or national origin was a determinative factor in her reassignment and termination.  *Id.* at 141.  The burden to demonstrate pretext can be met by substantial evidence of (1) disparate treatment or (2) that the employer's explanation is false or unworthy of credence.  *See Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016).

Rather than alleging disparate treatment, King's summary judgment response argues that the Defendants' stated reasons for its actions are false or unworthy of credence.  In support of this argument, King focuses on the various factual disputes surrounding the allegations that she engaged in financial impropriety and unprofessional conduct prior to her termination.  King vigorously disputes most of the accusations by Defendants.  Yet pointing out that there is a factual dispute as to whether the various improprieties and insubordination actually occurred (or whether they were intentional or accidental) does not, in itself, defeat Defendants' motion.  And in any event, as is detailed below, King concedes that at least some of the alleged incidents did occur.

Defendants have produced evidence of the following non-discriminatory reasons for King's January 2020 reassignment and her March 2020 termination related to King's performance.  Prior to her reassignment, there is evidence that Dr. Maika had concerns about

---

[2]  Defendants argue that King's reassignment to the Administrative Assistant position was not an adverse employment action under Title VII because it did not constitute a demotion. The Court need not consider this argument because, even assuming it was a demotion, King's claims fail as a matter of law on the issue of pretext.

King's failure to publish Board meeting minutes on time; her failure to post the September 2019 Board meeting agenda (resulting in the meeting having to be rescheduled); her disregard for an email from Associate Superintendent Newman regarding policies for providing testimonials about NEISD; and her manner of handling her responsibilities with respect to student certificates and recognitions.   Although King generally disputes these allegations, she admitted in her deposition that she did, in fact, at times fail to have Board meeting minutes ready for the regular meeting of subsequent months for the Board to approve.  (King Dep. [#25-1], at 171:14–20.) There is also undisputed evidence that King was responsible for posting the September 2019 Board meeting agenda; that Ms. Turner sent her an email with the agenda attached for posting at 12:03 p.m. on Friday afternoon; and that King did not post the agenda, whether because she did not see the email or for some other reason.  (Turner Email [#25-1], at 99.)

Regarding her termination several months later, there is evidence that NEISD conducted an investigation into allegations that King had intentionally removed a Board meeting agenda to sabotage the meeting.  The result of the investigation was the discovery of King's improper personal use of the District's tax-free Amazon account and her failure to reimburse the District for personal charges during her trip to Dallas and her stay at the Omni Hotel.  Although King generally disputes that these financial issues were intentional and argues they should have been resolved administratively (as they had been allegedly done in the past), there is no dispute that they did in fact occur.  (Jimenez Mem. [#25-1], at 216; Amazon Receipts [#25-1], at 223–25; King Email [#28-2], at 34.)  King testified in her deposition that she did not take any steps to ensure the District was reimbursed for sales tax from a purchase made from her personal account; she did not have permission to use NEISD's Amazon account to order personal items; and she did not reimburse NEISD for the personal charges during her trip to Dallas.  (King Dep.

[#25-1], at 110:1–111:15, 139:8–41:16.)  Finally, Defendants have produced evidence that after King's termination, an audit was conducted that identified several additional financial improprieties committed by King over the course of her employment.  King has not produced sufficient evidence to call into question the veracity of Defendants' stated reasons for her alleged demotion and ultimate termination so as to support an inference of unlawful discrimination.  *See Delaval*, 824 F.3d at 480.

Moreover, the Fifth Circuit has made clear that, even if Defendants and the District's investigator incorrectly assessed the facts related to any of King's alleged misconduct, Defendants' reliance on their mistaken conclusions or those of an investigator is still a legitimate, non-discriminatory reason for her reassignment and termination.  *See, e.g.*, *Hervey v. Miss. Dep't of Educ.*, 404 Fed. App'x 865, 871 (5th Cir. 2010) ("[A]gain, an incorrect belief in the underlying facts may constitute a legitimate, nondiscriminatory reason for an adverse employment decision."); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *Little v. Republic Ref. Co. Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991) (finding that employer's subjective belief in employee's poor performance, even if incorrect or inadequate constitutes a legitimate, non-discriminatory reason in absence of showing of improper motive).  Within the pretext analysis, this Court may not second guess Defendants' business decisions.  *Roberson-King*, 904 F.3d at 381.  "Management does not have to make proper decisions, only non-discriminatory ones."  *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

Accordingly, even if King disputes some of the facts upon which NEISD relied when making the decision to terminate her employment, ultimately, she still has to provide sufficient

evidence from which a factfinder could conclude that the real reason for any adverse employment action was unlawful discrimination.  Again, King can do this by showing that Defendants misrepresented their stated reasons for the adverse action or that comparators outside her protected class engaged in similar misconduct and were treated more favorably.  King has not produced any evidence of the foregoing, or any other evidence of disparate treatment based on her race, color, or national origin that suggests the true reason for her reassignment and termination were her protected characteristics.  The *only* evidence of discrimination referenced in King's summary judgment response is a statement by former NEISD Board member Mr. Trevino in his declaration that "[b]ased upon his personal experiences with parents, students, and some of the administrative staff," it was his "observation that there was systemic discrimination throughout the District particularly against Hispanics primarily at the Title I level."  (Trevino Decl. [#28-2], at ¶ 11.)  The undersigned sustained Defendants' objections to this statement.  And regardless, this statement does not provide any supporting detail or connect these general observations to King or the events underlying this suit.  King's response otherwise does not address Defendants' pretext argument whatsoever.

Moreover, King admitted in her deposition that she never heard Dr. Maika make any comments about her race or heard from any of the other employees of Dr. Maika that they perceived Dr. Maika's treatment of King to be based upon her race.  (King Dep. [#25-1], at 41:18–42:13.)  King further admitted that she never complained to anyone in Human Resources or on the NEISD Board about her suspicion that Dr. Maika was treating her differently based upon her race.  (*Id.* at 42:19–22.)  Rather, King testified that because she was the only Hispanic in the office, and Ms. Turner was White and non-Hispanic, she subjectively believed any differential treatment by Dr. Maika was on account of her race.  (*Id.* at 43:2–23.)

In summary, King has not produced sufficient evidence from which a factfinder could infer that Defendants reassigned King and ultimately terminated her employment because of her race, color, or national origin.  Defendants have satisfied their burden of production as to identifying legitimate, non-discriminatory reasons for the adverse employment actions at issue in this case, and King has not raised a genuine issue of material fact on the question of whether these reasons were in fact pretext for discrimination.  Defendants are therefore entitled to summary judgment.

### VI.  Conclusion and Recommendation

Having considered Defendant's motion, the response and reply thereto, the summary judgment record, and governing law, the undersigned recommends that Defendants' Motion for Summary Judgment [#25] be **GRANTED**.

### VII.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party

from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 15th day of February, 2023.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE